## Case No. 3,552.

### DALY v. PALMER et al.

[6 Blatchf. 256; [1] 8 Am. Law Reg. (N. S.) 286; 36 How. Pr. 206; 3 Am. Law Rev. 453.]

Circuit Court, S. D. New York.　Dec. Term, 1868.

COPYRIGHT—"DRAMATIC COMPOSITIONS" DEFINED —PANTOMIME—INFRINGEMENT—SALE OF INFRINGING PLAY.

1. What is meant by the provision in the copyright act of August 18, 1856 (11 Stat. 138), which confers on the author or proprietor of a copyrighted dramatic composition, designed or suited for public representation, along with the sole right to print and publish it, the sole right to act, perform or represent it on a stage or public place, defined.

2. A written play, consisting of directions for its representation by action, without the use of spoken language by the characters, is a dramatic composition, within that act.
[Cited in Carte v. Duff, 25 Fed. 187.]

3. The question of infringement of a copyrighted dramatic composition, considered.

4. The case of D'Almaine v. Boosey, 1 Younge & C. 288, cited and applied.

5. Under the act of 1856, the author of a copyrighted dramatic composition is entitled to be protected against piracy, in whole or in part, by representation.
[Cited in Henderson v. Tompkins, 60 Fed. 764.]

6. Where all that was substantial and material in a scene of a copyrighted play, a great part of such scene being represented by actions and not by spoken language, was used in the same order and sequence of events, and in a manner to convey the same sensations and impressions to those who saw it represented, held, that there was an infringement.
[Cited in Serrana v. Jefferson, 33 Fed. 348; Fuller v. Bemis, 50 Fed. 928. Followed in Daly v. Webster, 4 C. C. A. 10, 56 Fed. 483.]

7. The true test of piracy, in respect to a copyright, defined.

8. The sale of an infringing play to another, with a view to its public representation, makes the seller a participant in causing the play to be publicly represented.

In equity.  This was an application [by Augustin Daly] for a provisional injunction to restrain the defendants [Henry D. Palmer and Henry C. Jarrett] from the public performance and representation, and from the sale for dramatic representation, of a scene called the "Railroad Scene," in a play called "After Dark."

Thomas S. Alexander, William Tracy, and Joseph F. Daly, for plaintiff.

William D. Booth and Thomas W. Clarke, for defendants.

BLATCHFORD, District Judge. The plaintiff is, by profession, a dramatic author, his business being to compose, write, and produce on the theatrical stage, dramatic compositions, commonly called plays. The defendants are the managers of a public place of theatrical amusement in the city of New York, called "Niblo's Garden." Before the 1st of August, 1867, the plaintiff composed and wrote a dramatic composition called "Under the Gaslight," and on that day he took the proper steps to secure to himself a copyright for the composition, under the provisions of the act of February 3, 1831 (4 Stat. 436), by depositing before publication, a printed copy of the title of the composition, as author and proprietor, in the clerk's office of the district court of the southern district of New York, where he resided at the time.[2] The composition was afterwards printed and published, and, within three months from its publication, he caused a copy of it, as printed and published, to be delivered to said clerk.[3]

[2] NOTE [from original report in 3 Am. Law Rev. 456]. The record of title may be made after representation as well as before. Roberts v. Myers [Case No. 11,906], case of the "Octoroon." But it must be made before publication, otherwise the protection of the statute is lost. Bartlett v. Crittenden [Id. 1,076], "System of Bookkeeping." See, also, Jollie v. Jaques [Id. 7,437], case of the "Serious Family Polka;" Baker v. Taylor [Id. 782], case of the "Sacred Mountains;" Wheaton v. Peters, 8 Pet. [33 U. S.] 591, case of "Peters' Condensed Reports;" Dwight v. Appleton [Case No. 4,215], case of "Dwight's Theology;" Ewer v. Coxe [Id. 4,584], case of the "American Dispensatory."

[3] NOTE [from original report in 3 Am. Law Rev. 456]. This delivery of the copy of the published book is a necessary prerequisite to claiming protection of the statute against unauthorized publication, except under § 9, act of 1831 [4

He also gave information of copyright being secured, by causing to be printed and inserted in the several copies published, the words prescribed by the 5th section of the act.

The act of 1831 confers upon the author and proprietor of a dramatic composition, duly copyrighted, the sole right and liberty of printing, reprinting, publishing, and vending such composition, in whole or in part, for the term of twenty-eight years from the time of recording the title of such composition in the manner directed by the act. The act of August 18, 1856 (11 Stat. 138), provides, that any copyright thereafter granted under the laws of the United States, "to the author or proprietor of any dramatic composition, designed or suited for public representation, shall be deemed and taken to confer upon the said author or proprietor, his heirs and assigns, along with the sole right to print and publish the said composition, the sole right also to act, perform, or represent the same, or cause it to be acted, performed, or represented, on any stage or public place, during the whole period for which the copyright is obtained."

The bill alleges that the plaintiff's play was designed and suited for public representation; that it was represented for the first time on the 12th of August, 1867, under his direction and for his benefit, at the New York Theatre, a public place of theatrical amusement in New York, and was thenceforward represented there for eight consecutive weeks; that it met with great success, attracted crowds of persons, and was pecuniarily profitable to the plaintiff to a large amount; that the particular cause of such success was what was commonly called, after such public performance, the "Railroad Scene," at the end of the third scene of the fourth act, in which one of the characters is represented as secured by another, and laid helpless upon the rails of a railroad track, in such manner, and with the presumed intent, that the railroad train, momentarily expected, shall run him down and kill him, and, just at the moment when such a fate seems inevitable, another of the characters contrives to reach the intended victim, and to drag him from the track as the train rushes in and passes over the spot; that this incident and scene was entirely novel, and unlike any dramatic incident known to have been theretofore represented on any stage, or invented by any author before the plaintiff so composed, produced, and represented the same; that the playing of said composition and scene caused the same to become famous in all parts of the United States and Canada, and in England; that the chief value of the composition and its popularity depend upon said "railroad scene;" that it was repeatedly produced and represented by and for the advantage of the plaintiff, in many cities and towns of the United States and Canada,[4] to the profit of the plaintiff; that, before learning of the alleged wrongs mentioned in the bill attempted by the defendants, the plaintiff had made arrangements for representing the play dramatically at New York, and in various places in the United States, during the present winter and the approaching spring; that he accordingly commenced to represent the play at the New York Theatre, in the city of New York, on the 4th of November, 1868; that, soon after the production, representation, and printing of the play in the United States, one Dion Boucicault, a dramatic author and actor and theatrical manager, a subject of Great Britain, residing in England, procured a copy of said play by some means, and, without the knowledge or consent of the plaintiff, prepared therefrom a play, which he called "After Dark," in which play he introduced several of the scenes and incidents of the plaintiff's play, varying them slightly, but following in them the invention and plan of the plaintiff's play, in a manner which was intended to differ from it only slightly, so as colorably to be a different work, while substantially retaining the attractive features of the plaintiff's play, and which contained, with only colorable variations, the said "railroad scene," of the plaintiff's play, substituting for the surface rail-

Stat. 438]. Ewer v. Coxe [Case No. 4,584]; Wheaton v. Peters. 8 Pet. [33 U. S.] 591. But if the book is published in more than one volume. delivery of the first volume within the period limited by law, and of the others before action is brought, is held sufficient. Dwight v. Appleton [Case No. 4,215]. And if the book be not printed, the author may maintain his action for an infringement; and the acting of a play is not such a publication as to require the printed copy to be filed with the clerk. Roberts v. Meyers [Id. 11,906]. The action for infringement of the author's rights, after deposit of title and before the deposit of the book, cannot be maintained under the statute. Keene v. Wheatley [Id. 7,644], Cadwalader, J., 1860, U. S. Cir. Ct. Pa., case of "Our American Cousin." These discrepancies disappear, when we consider that, before publication by the author, he has a right, independent of the statute, to restrain any and every use of his work, except such as is fairly derived from him by the degree of publicity he may have given it. Keene v. Kimball, 82 Mass. [16 Gray] 545, case of "Our American Cousin;" Id., 2 Abb. Pr. (N. S.) 341, case of "Our American Cousin;" Boucicault v. Wood [Case No. 1,693], cases of the "Octoroon," "Pauvrette," and "Colleen Bawn." And even filing the title gives an equitable right, which a chancery court of the United States will protect till the acts required for perfecting the legal title can be done. Pulte v. Derby [Case No. 11,465], case of "Homeopathic Domestic Physician." After publication the author must rely on the statute only. Jeffries v. Boosey, 4 H. L. Cas. 815, and cases cited; Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 662. See, also, Clayton v. Stone [Case No. 2,872], case of the "Commercial Advertiser;" Blunt v. Patten [Id. 1,580], case of "Chart of Nantucket Shoal;" Stowe v. Thomas [Id. 13,-514], translation of "Uncle Tom's Cabin." A very full discussion of the subject of property in unpublished manuscripts is to be found in Woolsey v. Judd, 4 Duer, 379. which was a case of publication of private letters.

[4] NOTE [from original report in 3 Am. Law Rev. 457]. The value of the piece in Canada could not be material to the issue, and it may be questioned if the rights of the English author in Canada can be affected by a decision here.

road an underground railroad, for the rescuer of the victim to be killed on the railroad a man for a woman, for the railroad station in which the rescuer was confined a cellar, and for the breaking down a door to escape and rescue the victim the breaking down a wall or the door in a wall; that the work of Boucicault is a palpable imitation of the plaintiff's said "railroad scene," and is plagiarized therefrom, and put into the play called "After Dark," by Boucicault, for the purpose of obtaining the pecuniary benefit which might otherwise result to the plaintiff from the representation of his play; that the play of "After Dark" was performed in England without the plaintiff's consent,[5] to the great profit of Boucicault, and was indebted for its success and profit to such imitation of said "railroad scene;" that Boucicault has sent copies of his play, containing such plagiarism of said "railroad scene" to the defendants in the United States, for sale and performance for his own profit, and several copies of it are in the defendants' possession; that the defendants are intending and have announced their purpose, to perform such play called "After Dark," publicly on the stage, at Niblo's Garden, in New York, on the 16th of November, 1868, and every night thereafter, till further notice, without the consent of the plaintiff; that such play, and the plagiarism of said "railroad scene" are being rehearsed at Niblo's Garden, under the direction of the defendants, with a view to such public performance thereof; and that the defendant Palmer, acting for Boucicault, is about to sell copies of the play called "After Dark," with said plagiarized scene, to other persons in the United States, to be publicly represented. The bill prays for an injunction to restrain the defendants from the public representation, and from the sale for dramatic representation, of the said "railroad scene" in "After Dark."

The defence to the application, on the facts, is confined to showing, by affidavits, that the following matters were known prior to the taking out by the plaintiff of his copyright, namely, the representation on a stage of a train of cars drawn by a locomotive engine on a railroad; a like representation wherein the train appeared to run over a man lying on the track; and a like representation wherein the train appeared to run over a man lying on the track, who had been thrown thereon in a helpless condition by another of the characters, in order that he might be run over and killed. A story called "Captain Tom's Fright," in "The Galaxy" for March 15th, 1867, is also adduced to affect the validity of the plaintiff's copyright.[6] There is no answer to the bill, nor is there any denial of the allegations that Boucicault procured a copy of the plaintiff's play and prepared therefrom the "railroad scene" in the play of "After Dark," and intended that the latter should only be colorably different from the "railroad scene" in the plaintiff's play, by making the substitutions before mentioned, and that the "railroad scene," in the play of "After Dark," was plagiarized by Boucicault from the "railroad scene" in the plaintiff's play.

In the plaintiff's play, there is a surface railroad, with a railroad station, and a signal-station shed, or store-room. A signal man appears, and a woman named Laura. At the request of Laura, the signal man locks her in the shed. There are some axes in it. One Snorkey then appears. The signal man then goes off. One Byke then enters, with a coil of rope in his hand, and throws it over Snorkey, and tightens it around his arm, and coils it around his legs, and then lays him across the track and fastens him to the rails, and goes off, having, by language, given it to be understood that the intention is that Snorkey shall be run over by the train and killed. Laura, from a window in the shed, sees what is done. The steam whistle of the train is heard. She takes an axe and strikes the door. The whistle is heard again, with the rumble of the approaching train. She gives more blows on the door with the axe, it opens, she runs and unfastens Snorkey, the lights of the engine appear, and she moves Snorkey's head from the track as the train rushes past. This incident occupies the whole of the third scene of the fourth act. There is a good deal of conversation, first, between the signal man and Laura, and then between Snorkey and the signal man, and then between Byke and

---

[5] NOTE [from original report in 3 Am. Law Rev. 458]. In the absence of an international copyright, the performance of an English play in England, without the consent of an American author, seems immaterial. The English copyright act (7 & 8 Vict. c. 12, § 19) requires the first publication or representation of a work, except such works as come within that statute, to be made in England, in order to have legal protection there. Boucicault v. Delafield, 33 Law Jour. (N. S.) 38, case of the "Colleen Bawn," a play written, copyrighted, and first performed, by an English author, then a resident of the United States, within the United States, never printed by the author's consent, subsequently copyrighted in England, where the vice chancellor held the English copyright bad.

[6] NOTE [from original report in 3 Am. Law Rev. 454]. The outline of this story may be given as follows: Captain Tom is engineer on a railway in charge of a construction gang. His gang mutinies one night, his arms are taken from him, and he is knocked down senseless. When he recovers, he finds he is bound and laid on the ground, an iron bar under his head, another under his legs. By degrees, he finds that he is fastened to the rails of a track on the side of a river, near a bridge, which is under repair by Captain Tom's gang. He wonders if the train has passed, due at eleven o'clock p. m. He sees, far over the prairie, the head-light of the locomotive, like a distant star. He screams for help and hears only the mutineers carousing. The train comes nearer and nearer, the bridge trembles at its approach, the lights glare in his eyes, the hot breath of the engine is in his face. He swoons from terror. The wheels are within a foot of his head. The engine and train had passed on a side track, temporarily laid down for the repairs of the bridge while Captain Tom was tied on the straight track of the road.

Snorkey, and then between Laura and Snorkey. There are stage directions for Laura to go into the shed, for the signal man to lock her in, for Snorkey to enter, for the signal man to go off, for Byke to enter with the coil of rope, for Byke to throw the coil over Snorkey, and tighten the rope around Snorkey's arm and coil it around his legs, for Byke to lay Snorkey across the track, and fasten him to the rails, for Byke to go off, for the steam whistle to be heard, for blows at the door to be heard, for the steam whistle to be heard again, with the rumble of the train, for more blows on the door to be heard, for the door to open, for Laura to appear with the axe in her hand, for her to run and unfasten Snorkey, for the lights of the engine to be seen, for Laura to take Snorkey's head from the track, and for the train to rush past. These stage directions are separate and apart from the conversation, and are in italics and in parentheses, at the appropriate places in the progress of the scene. The substance and purport of the successive conversations in the scene are, that Laura requests the signal man to lock her in the shed, and he consents, that Snorkey requests the signal man to stop by signal the expected train, and he refuses, that Byke gives Snorkey to understand that he is to be run over and killed by the train, and that Snorkey requests Laura to break down the door and release him. The idea is also conveyed, by the language in the scene, that Byke is about to commit robbery and murder at Laura's house, and that Snorkey is trying to give information of the fact.

In the play of "After Dark," the "railroad scene" is in the third act. In the first scene of that act, one Gordon Chumley is rendered insensible by drugs, and one Old Tom is thrown by force into a wine vault. In the second scene of that act, Old Tom is represented as in the vault. There is an orifice in the vault, which opens upon the track of an underground railroad. The rumbling of cars is heard, and lights flash through the orifice. Old Tom, through a door into an adjoining vault, sees two of the characters carry Chumley, and break a hole through a wall, and pass the body of Chumley through the hole, for concealment, as he supposes, in a well or vault. Old Tom then finds an iron bar, and resolves to attempt escape, by enlarging the orifice in the wall opening on the railroad. Then follows scene third. The railroad is seen, with a circular orifice which ventilates the cellar in which Old Tom is. The body of Chumley is seen lying across the rails, and the arm of Old Tom, and then his head, are passed through the orifice. For this much of the scene there are only stage directions, without spoken words. The following is a verbatim copy of the rest of the scene, the parts in parentheses being stage directions: "Old Tom. About four courses of bricks will leave one room to pass. What is that on the line? There is some-

thing, surely, there. (A distant telegraph alarm rings. The semaphore levers play, and the lamps revolve.) Great Heaven! 'tis Gordon. I see his pale upturned face—he lives! Gordon! Gordon! I'm here. He does not answer me. (A whistle is heard, and distant train passes.) Ah! murderers. I see their plan. They have dragged his insensible body to that place, and left him there to be killed by a passing train. Demons! Wretches! (He works madly at the orifice. The bricks fall under his blows. The orifice increases. He tries to struggle through it.) Not yet. Not yet. (The alarm rings again. The levers in the front play. The red light burns, and a white light is turned to L. H. tunnel. The wheels of an approaching train are heard.) Oh, heaven! give me strength—down—down. One moment! (A large piece of wall falls in, and Old Tom comes with it.) See, it comes, the monster comes. (A loud rumbling and crashing sound is heard. He tries to move Gordon, but seeing the locomotive close on him, he flings himself on the body, and, clasping it in his arms, rolls over with it forward. A locomotive, followed by a train of carriages, rushes over the place, and, as it disappears, Old Tom frees himself from Chumley, and gazes after the train.)" The play of "After Dark" has never been published by Boucicault, although printed by him for private use.

The first inquiry is, what is meant, in the act of 1856, by a "dramatic composition," what is meant by the "public representation" of a dramatic composition, and what is meant by the right to "act, perform, or represent" a dramatic composition, on a "stage or public place." The act of 1856 confers on the author or proprietor of a copyrighted "dramatic composition, designed or suited for public representation," the sole right of acting, performing, or representing the same on a stage or public place, in addition to the sole right to print and publish such composition. The latter right must be considered as being conferred by the act of 1831, for, although that act only speaks of a copyright for a "book or books, map, chart, musical composition, print, cut, or engraving," yet, under the language of the act of 1856, a "dramatic composition, designed or suited for public representation," must be regarded as embraced within the act of 1831.

A composition, in the sense in which that word is used in the act of 1856, is a written or literary work invented and set in order. A dramatic composition is such a work in which the narrative is not related, but is represented by dialogue and action. When a dramatic composition is represented, in dialogue and action, by persons who represent it as real, by performing or going through with the various parts or characters assigned to them severally, the composition is acted, performed, or represented; and, if the representation is in public, it is a public representation. To act, in the sense of the

statute, is to represent as real, by countenance, voice, or gesture, that which is not real. A character in a play who goes through with a series of events on the stage without speaking, if such be his part in the play, is none the less an actor in it than one who, in addition to motions and gestures, uses his voice. A pantomime is a species of theatrical entertainment, in which the whole action is represented by gesticulation, without the use of words. A written work. consisting wholly of directions, set in order for conveying the ideas of the author on a stage or public place, by means of characters who represent the narrative wholly by action, is as much a dramatic composition designed or suited for public representation, as if language or dialogue were used in it to convey some of the ideas. The "railroad scene," in the plaintiff's play, is undoubtedly a dramatic composition. Those parts of it represented by motion or gesture, without language, are quite as much a dramatic composition, as those parts of it which are represented by voice. This is true, also, of the "railroad scene" in "After Dark." Indeed, on an analysis of the two scenes in the two plays, it is manifest that the most interesting and attractive dramatic effect in each is produced by what is done by movement and gesture, entirely irrespective of any thing that is spoken. The important dramatic effect, in both plays, is produced by the movements and gestures which are prescribed, and set in order, so as to be read, and which are contained within parentheses. The spoken words in each are of but trifling consequence to the progress of the series of events represented and communicated to the intelligence of the spectator, by those parts of the scene which are directed to be represented by movement and gesture. The series of events so represented, and communicated by movement and gesture alone to the intelligence of the spectator, according to the directions contained in parentheses, in the two plays in question here, embraces the confinement of A. in a receptacle from which there seems to be no feasible means of egress; a railroad track, with the body of B. placed across it, in such manner as to involve the apparently certain destruction of his life by a passing train; the appearance of A. at an opening in the receptacle, from which A. can see the body of B.; audible indications that the train is approaching; successful efforts by A., from within the receptacle, by means of an implement found within it, to obtain egress from it upon the track; and the moving of the body of B., by A., from the impending danger, a moment before the train rushes by. In both of the plays, the idea is conveyed that B. is placed intentionally on the track, with the purpose of having him killed. Such idea is, in the plaintiff's play, conveyed by the joint medium of language uttered, and of movements which are the result of prescribed directions,

while, in Boucicault's play, it is conveyed solely by language uttered. The action, the narrative, the dramatic effect and impression, and the series of events in the two scenes, are identical. Both are dramatic compositions, designed, or suited, for public representation. It is true that, in one, A. is a woman, and, in the other, A. is a man; that, in one, A. is confined in a surface railroad station shed, and, in the other, A. is confined in a cellar abutting on the track; that, in one, A. uses an axe, and, in the other, A. uses an iron bar; that, in one, A. breaks down a door, and, in the other, A. enlarges a circular hole; that, in one, B. is conscious, and is fastened to the rails by a rope, and, in the other, B. is insensible, and is not fastened; and that, in one, there is a good deal of dialogue during the scene, and, in the other, only a soliloquy by A., and no dialogue. But the two scenes are identical in substance, as written dramatic compositions, in the particulars in which the plaintiff alleges that what he has invented, and set in order, in the scene, has been appropriated by Boucicault.

Nor is this a case of first impression. An arrangement of musical notes, forming a tune or air, is a musical composition; and the author who has invented it, and set it in order, and copyrighted it, is entitled to protection. The extent of that protection has been the subject of judicial interpretation.[7] In the case of D'Almaine v. Boosey, 1 Younge & C. 288, the plaintiffs, proprietors of the copyright of an opera of Auber's, and also of another copyright of the overture of the same opera, and also of another copyright of the airs of the same opera, filed a bill in equity to restrain the defendant from infringing such copyrights. The defendant had published several of the airs, with some alterations, in the shape of quadrilles and waltzes. It was claimed, on the part of the defendant, that his work was merely an adaptation of the original, and, therefore, not a piracy. But the court (Lord Chief Baron Lyndhurst) held, that if the defendant had published the original air, though with adaptations and harmonies, or for different instruments, it was a piracy, and that it was not like the case of an abridgment of a book, where the purpose of the abridgment was distinct from that of the work from which it was taken. On this subject, the court says: "It is admitted that the defendant has published portions of the opera containing the melodious

---

[7] NOTE [from original report in 3 Am. Law Rev. 463]. There may be a copyright, as in the case of the "Low-Backed Car," where the author wrote words, accompaniment, and prelude, to the old air of the "Jolly Ploughboy." Lover v. Davidson, 1 C. B. (N. S.) 182; or, as in the case of "Pestel," where an author wrote words for an old air, and got a friend to write an accompaniment, and then entered the whole at Stationer's Hall. It was held, his assignee had copyright in the accompaniment. Leader v. Purday, 7 C. B. 4.

parts of it; that he has also published entire airs; and that, in one of his waltzes, he has introduced seventeen bars, in succession, containing the whole of the original air, although he adds fifteen other bars which are not to be found in it. Now, it is said that this is not a piracy, first, because the whole of each air has not been taken; and, secondly, because what the plaintiffs purchased was the entire opera, and the opera consists, not merely of certain airs and melodies, but of the whole score. But, in the first place, piracy may be of part of an air, as well as of the whole; and, in the second place, admitting that the opera consists of the whole score, yet, if the plaintiffs were entitled to the whole, a fortiori, they were entitled to publish the melodies which form a part. Again, it is said that the present publication is adapted for dancing only, and that some degree of art is needed for the purpose of so adapting it, and that but a small part of the merit belongs to the original composer. That is a nice question. It is a nice question what shall be deemed such a modification of an original work as shall absorb the merit of the original in the new composition. No doubt such a modification may be allowed in some cases, as in that of an abridgment or a digest. Such publications are, in their nature, original. Their compiler intends to make of them a new use, and not that which the author proposed to make. Digests are of great use to practical men, though not so, comparatively speaking, to students. The same may be said of an abridgment of any study; but it must be a bonâ fide abridgment, because, if it contains many chapters of the original work, or such as made that work most saleable, the maker of the abridgment commits a piracy. Now, it will be said, that one author may treat the subject very differently from another who wrote before him. That observation is true in many cases. A man may write upon morals in a manner quite distinct from that of others who preceded him; but the subject of music is to be regarded upon very different principles. It is the air or melody which is the invention of the author, and which may, in such case, be the subject of piracy; and you commit a piracy, if, by taking, not a single bar, but several, you incorporate in the new work that in which the whole meritorious part of the invention consists. * * * Now, it appears to me, that if you take from the composition of an author all those bars consecutively which form the entire air or melody, without any material alteration, it is a piracy; though, on the other hand, you might take them in a different order, or broken by the intersection of others, like words, in such a manner as should not be a piracy. It must depend on whether the air taken is substantially the same with the original. Now, the most unlettered in music can distinguish one song from another, and the mere adaptation of the air, either by

changing it to a dance, or by transferring it from one instrument to another, does not, even to common apprehensions, alter the original subject. The ear tells you that it is the same. The original air requires the aid of genius for its construction, but a mere mechanic in music can make the adaptation or accompaniment. Substantially, the piracy is, where the appropriated music, though adapted to a different purpose from that of the original, may still be recognized by the ear. The adding variations makes no difference in the principle." An injunction was granted. The views of Lord Lyndhurst, in that case, were cited and approved by Mr. Justice Nelson, in this court, in the case of Jollie v. Jaques [Case No. 7,437]. They are eminently sound and just, and are applicable to the case of a dramatic composition designed for public representation. Such a composition, when represented, excites emotions and imparts impressions not merely through the medium of the ear, as music does, but through the medium of the eye as well as the ear. Movement, gesture, and facial expression, which address the eye only, are as much a part of the dramatic composition as is the spoken language which addresses the ear only; and that part of the written composition which gives direction for the movement and gesture, is as much a part of the composition, and protected by the copyright, as is the language prescribed to be uttered by the characters. And this is entirely irrespective of the set of the stage, or of the machinery or mechanical appliances, or of what is called, in the language of the stage, scenery, or the work of the scene-painter.

Now, in consonance with the principles laid down by Lord Lyndhurst, the plaintiff is as much entitled to protection in respect of a substantial and material original part of his "railroad scene" as he is in respect of the whole.[3] Under the act of 1856, construed in

[3] NOTE [from original report in 3 Am. Law Rev. 465]. In the case of Turner v. Robinson, 10 Ir. Ch. 121, on appeal, Id. 510, the plaintiff was proprietor of a picture, "Death of Chatterton," had publicly exhibited it in sundry places, and was having an engraving made from it. The picture had been engraved in a catalogue previously, in a cheap way, and no objection was made to this by the proprietor. The defendant arranged a tableau vivant in his studio following the grouping of, and with a painted background like the one in the picture, and took a pair of photographs for the stereoscope from this group. Sale of the photographs was enjoined. In considering whether there is infringement of copyright, we often have to consider the quality of the matter taken, rather than its quantity. Gray v. Russell [Case No. 5,728], case of "Adam's Latin Grammar;" Folsom v. Marsh [Id. 4,901], case of "Spark's Life of Washington;" Story v. Holcombe [Id. 13,497], case of "Story's Equity Pleadings." And it is no defence that only part of the work is taken, because the owner of the copyright owns it all. Folsom v. Marsh, supra. In an action for penalties the rule is different; the whole work must be taken, not merely so much as to render one liable to action for infringement. Rogers v.

connection with the act of 1831, he is entitled to be protected against piracy, in whole or in part, by representation as well as by printing, publishing, and vending. Although the act of 1831, in regard to printing, publishing, and vending, uses the words "in whole or in part," and the act of 1856, in regard to representing, does not use those words, yet the act of 1856, by referring, as it does, to the right conferred by the act of 1831, as the "sole right to print and publish" the copyrighted composition, when such right is, on the face of the act of 1831, the sole right to print and publish "in whole or in part," and by then conferring "the sole right also to act, perform, or represent the same, or cause it to be acted, performed, or represented, on any stage or public place," must be held to confer the right to represent in whole or in part. All that is substantial and material in the plaintiff's "railroad scene" has been used by Boucicault, in the same order and sequence of events, and in a manner to convey the same sensations and impressions to those who see it represented, as in the plaintiff's play. Boucicault has, indeed, adapted the plaintiff's series of events to the story of his play, and, in doing so, has evinced skill and art; but the same use is made, in both plays, of the same series of events, to excite, by representation, the same emotions, in the same sequence. There is no new use, in the sense of the law, in Boucicault's play, of what is found in the plaintiff's "railroad scene." The "railroad scene" in Boucicault's play contains everything which makes the "railroad scene" in the plaintiff's play attractive, as a representation on the stage. As, in the case of the musical composition, the air is the invention of the author, and a piracy is committed if that in which the whole meritorious part of the invention consists is incorporated in another work, without any material alteration in sequence of bars, so, in the case of the dramatic composition, designed or suited for representation, the series of events directed in writing by the author, in any particular scene, is his invention, and a piracy is committed if that in which the whole merit of the scene consists, is incorporated in another work, without any material alteration in the constituent parts of the series of events, or in the sequence of the events in the series. The adaptation of such series of events to different characters who use different language from the characters and language in the first play, is like the adaptation of the musical air to a different instrument, or the addition to it of variations or of an accompaniment. The original subject of invention, that which required genius to construct it and set it in order, remains the same, in the adaptation. A mere mechanic in dramatic composition can make such adaptation, and it is a piracy, if the appropriated series of events, when represented on the stage, although performed by new and different characters, using different language, is recognized by the spectator, through any of the senses to which the representation is addressed, as conveying substantially the same impressions to, and exciting the same emotions in, the mind, in the same sequence or order. Tested by these principles, the "railroad scene" in Boucicault's play, is, undoubtedly, when acted, performed, or represented on a stage or public place, an invasion and infringement of the copyright of the plaintiff in the "railroad scene" in his play.

The substantial identity between the two scenes would naturally lead to the conclusion, that the later one had been adapted from the earlier one. The charge of actual plagiarism on the part of Boucicault, made in the bill, is not denied. It is hardly possible that the resemblances are accidental, and that the differences are not merely colorable, with a view to disguise the plagiarism. The true test of whether there is piracy or not, is to ascertain whether there is a servile or evasive imitation of the plaintiff's work, or whether there is a bona fide original compilation, made up from common materials, and common sources, with resemblances which are merely accidental, or result from the nature of the subject. Emerson v. Davies [Case No. 4,436].

Nothing that has been adduced on the part of the defendants affects the validity of the plaintiff's copyright, on the question of the originality and novelty of the "railroad scene" in his play.[9]

The sale of Boucicault's play to other persons, with a view to its public representation, makes the seller a participant in causing the play to be publicly represented.

Jewett [Case No. 12,012]. The plaintiff had published a book called "Philosophy of Mysterious Agents, Human and Mundane; or, The Dynamic Laws and Relations of Man. embracing the Natural Philosophy of Phenomena styled Spiritualism," and the defendants had copied a large part of this book in a publication called "Modern Mysteries Explained and Exposed." A demurrer to an action of debt for the penalty of fifty cents a sheet, under St. 1831, c. 16, p. 6, was sustained, though an action on the case for damages might have been sustained. See Atwill v. Ferrett [Case No. 640], case of "Bohemian Girl;" Dwight v. Appleton [Id. 4,215]; and Backus v. Gould, 7 How. [48 U. S.] 798, case of "Cowen's and Wendell's Reports." Quaere, as to the rule of damages under the act of 1856, c. 169, establishing a rate of damages at not less than one hundred dollars for the first, and fifty dollars for subsequent performances of a copyrighted play,—in case only a very small part of the play is borrowed. Consult on this point, cases on confusion of goods, 2 Bl. Comm. 405, and cases cited in Wendell's edition. See, also Hart v. Ten Eyck, 2 Johns Ch. 62; Gillespie v. Moon, Id. 585; Brackenridge v. Holland, 2 Blackf. 377.

9 NOTE [from original report in 3 Am. Law Rev. 467]. Descriptive matter in a record of title is no part of the title. Thus a book described in the record as in a certain number of volumes may be published in a different number. Dwight v. Appleton [Case No. 4,215].

An injunction must, therefore, issue, restraining the defendants from the public performance and representation, and from the sale, for public performance or representation, of the "railroad scene" in the play of "After Dark," or of any scene in substance the same as the "railroad scene" in either of the two plays, as such scene is herein defined.