**INTERNATIONAL FILM SERVICE CO., Inc., et al. v. AFFILIATED DIS-TRIBUTORS, Inc., et al.**

(District Court, S. D. New York. August 29, 1922.)

I. Copyrights ☜55—Copyrighted novel and film held infringed by another motion picture film having similar incidents.

A copyright covering a motion picture based on a novel *held* infringed by another motion picture film, where in each the hero and the villain were members of the Canadian mounted police, and in each the hero, described as the best "man trapper" in the service, believing that he was about to die, confessed to a crime of which he was not guilty, and subsequently recovered to face hanging for such crime, and resorted to flight in company with the heroine, and was later arrested and imprisoned, and deliverance either came or began to come while he was awaiting transportation to another place for trial.

2. Copyrights ☜55—Old and well-known literary material, if creating novel situation, may be infringed.

Though the subject-matter of a literary work is well within the public domain, it may be so utilized as to setting, atmosphere, sequence of events, and detail of narrative as to constitute an infringement on the work of one who, while using old and well-known means, has created a novel situation.

3. Copyrights ☜86—Infringers given opportunity to change motion picture film, so as to eliminate infringing incidents.

Where a motion picture film infringing a copyright was produced at considerable expense and has been extensively advertised and can as claimed by the infringers, be so changed as to eliminate the infringing incidents, they will be given an opportunity to so change it before an injunction will be granted, wholly restraining its production.

In Equity. Suit by the International Film Service Company, Inc., and another, against the Affiliated Distributors, Inc., and others. Injunction granted.

See, also, Curwood v. Affiliated Distributors (D. C.) 283 Fed. 219 and 223.

Nathan Burkan, of New York City, for plaintiffs.

Neuman & Newgass, of New York City (Frederick F. Neuman, of New York City, of counsel), for defendants Affiliated Distributors, Inc., Edwin Carewe Pictures Corporation, and Carewe, Fineman, Zeidman, Burr, and Schrock.

Thomas & Friedman, of New York City (Abel Cary Thomas, of New York City, of counsel), for defendants Warner.

Harold S. Bareford, of New York City, for defendant Schlessinger.

KNOX, District Judge. Some time prior to August 1, 1919, James Oliver Curwood wrote a certain novel entitled "The Valley of Silent Men." He sold the publication rights thereof to International Magazine Company, Inc. (hereinafter called the Magazine Company), with the privilege of securing copyright thereon, reserving to himself, however, the exclusive right to reproduce the story in motion pictures. The novel was first published in serial form in a periodical known as "Good Housekeeping," beginning in the issue of September, 1919, and concluding in the edition of June, 1920. Each installment so published was duly copyrighted by the Magazine Company, which owned or con-

trolled "Good Housekeeping." Thereafter, and prior to September 4, 1920, the Magazine Company assigned the copyright thus secured to Cosmopolitan Book Corporation (hereinafter called the Book Company), and this latter concern issued "The Valley of Silent Men" in book form, and duly obtained copyright thereon. Several editions of the book, each copyrighted, have been issued, and more than 100,000 copies have been sold.

Meanwhile Curwood disposed of the story's motion picture rights to his wife, and in March of 1920, she and her husband duly assigned to the Magazine Company, and it, in turn, transferred the same to International Film Service Company, Inc. (hereinafter called the Film Company), which retains them. In the exercise of its property rights therein the Film Company has produced, and is about to release for exhibition, a motion picture based upon the Curwood story, and which will bear a title identical with that of the book. The picture is upon an elaborate scale, and, when entirely completed and released, will have cost between $175,000 and $200,000. Certain preliminary advertising of the picture has been carried out, and the trade, generally speaking, is advised of the forthcoming release.

In January of this year the defendants Burr, Carewe, Fineman, and Zeidman, each of whom is possessed of considerable experience in the motion picture industry, conceived the idea of making for release and distribution in the early summer of what is known in the trade as a "snow picture"; that is, a picture in which snow and ice scenes predominate. They got in touch with the defendant Schrock, a motion picture writer, who is the reputed author of a scenario entitled, "Hell's Highway," but which, upon being reproduced in motion pictures, is called "I Am the Law." At the time Schrock was approached by Burr and his associates, he is said to have had on hand the "Hell's Highway" scenario. He gave a synopsis of it to Carewe, who directed that it be reduced to writing and again submitted to him. This being done, it was once more considered, and the conclusion reached that the scenario had the making of a "corking good Hudson Bay country northwest picture," but that, like all motion picture material, it would require "doctoring." After consultation between Burr, Carewe, Fineman, and Zeidman, the Schrock story was thought suitable for their purpose and it was accordingly purchased.

Under the contract of sale with Schrock, who is, comparatively speaking, little known as an author, it was agreed that Burr and his associates might acquire the name of any other author as one to be used in connection with the picture to be produced from the scenario. It was stipulated, however, that an inscription should appear upon all advertising and upon the completed film, substantially as follows:

"Scenario and photoplay—by Raymond L. Schrock, as suggested by story of [name of author] or adapted from [such story as Burr and his associates might designate]."

The scenario, thus acquired, was subjected to more or less elaboration by Carewe, Zeidman and Fineman; a company of actors was organized and taken to California, where, under the direction of Carewe, the picture, "I Am the Law," was produced. It is what is known as a

"feature picture" in seven reels, and it may fairly be said to be a production out of the ordinary run of photo plays. With reasonable fidelity it follows the outline of the Schrock story. The defendant Edwin Carewe Picture Corporation is the corporate identity under which Burr, Carewe, Fineman, and Zeidman produced the picture, and the defendant Affiliated Distributors, Inc., is the corporation through which the film is being distributed to exhibitors. The defendants Abraham and Harry Warner and the defendant Schlessinger were interested in the handling of foreign rights to the picture. These last-named defendants, by reason of warnings issued by the solicitor for plaintiffs, have played a very subordinate part in the matters complained of. They have expressed their willingness to abide by any decree the court may make herein, and for the present discussion they need not further be considered.

When Burr, Carewe, Fineman, and Zeidman first negotiated as to the feasibility of producing a "snow picture," it was thought desirable to use the name of James Oliver Curwood in connection therewith. The reason for this was that Curwood, as the author of the novel hereinbefore mentioned, and of numerous Canadian Northwest tales, had gained an enviable reputation as a writer of this class of fiction. To Burr's mind the value of a moving picture laid in the Northwest would thereby be enhanced. The plot and scenes in the Schrock scenario, of which more will be said hereafter, are laid in the Canadian Northwest Territory, and the principal male characters therein are members of the police force, popularly known as the Canadian Royal Mounted; and such, too, may be said of the plot, scenes and principals of "The Valley of Silent Men."

In pursuance of the desire and purpose to use Curwood's name upon the picture, "I Am the Law," and which was then in process of production, Burr was taking measures designed to secure such right. The means employed in this behalf are related in detail in my opinion, dated July 22, 1922, and filed in the suit of James Oliver Curwood v. Affiliated Distributors, Inc., et al. (D. C.) 283 Fed. 291. At this moment, it will suffice to record that Burr and his associates acquired the screen rights to a story written by Curwood many years before, and which was long ago published in Outing Magazine under the title "The Poetic Justice of Uko San." The tale related to three bears that two hunters came upon in the Canadian Northwest, and, aside from the location in which its. action takes place, has not the slightest resemblance to any scene or incident in "Hell's Highway" or in the picture "I am the Law." Nevertheless, when the latter picture was first advertised and shown, it was heralded as having been founded on James Oliver Curwood's latest story, "The Poetic Justice of Uko San." For reasons appearing in my aforementioned opinion in the suit of Curwood v. Affiliated, et al., I have restrained the further use of such misrepresentation.

This rather lengthy preamble has been thought appropriate to my discussion of the merits of the matter here involved, to the end that, from the viewpoint thus had, a somewhat more discerning comparison may be made between the leading incidents and events set forth in the. scenario written by Schrock and embodied in the picture "I Am the

Law," and those contained in Curwood's story, "The Valley of Silent Men." The synopsis of "I Am the Law," as detailed by the defendant Burr is as follows:

"Two brothers were members of the Royal Northwest Mounted Police at the little settlement of Paradise. One, Corporal Fitzgerald, was counted the best man tracker in the north and a credit to the Mounted; his younger and weak brother, Tom, private, had often been reprimanded for misconduct (by the commandant), and at the time the story opens he was carrying on a secret affair with the wife of the commanding officer at the post. The corporal had learned of it, and reproved his brother, but Tom defied him. A school-teacher, Joan Cameron, in traveling through the forest, had been caught in a storm, and had taken refuge at the notorious dance hall conducted by a half-breed Chinaman, who was pressing his advances upon her when the corporal arrived and killed him. After rescuing the teacher, the two encountered Tom, who made love to her and won her promise to marry him. The corporal, who had fallen in love with her, resigned in favor of his younger brother and wished them well.

"The commanding officer at the post started on a journey, and Tom lost no time in going to his home and resuming his love affair with the false wife. Forgetting some papers, the officer returned home, to find Tom and his wife drinking together and caressing each other. He lashed Tom with a dog whip, and Tom got possession of his revolver and shot him dead. Tom took the dead man's dog team and escaped into the wilds. The call of duty forced the corporal to pursue his brother. They met in a blizzard on a mountain side, and after a struggle the corporal was thrown down the mountain side. Tom found refuge in the cabin of the school-teacher, where later the corporal found him and placed him under arrest. In reply to his brother's entreaty the corporal could only answer, 'I Am the Law.'

"The storm grew worse, and the corporal's exposure brought on pneumonia. He felt he was dying, and could not bear the thought of his widowed mother losing him by illness, and her younger son upon the gallows. So he had paper and pen brought him, and he wrote and signed a confession to the murder. Then he dropped back upon the cot, apparently dead; but with Joan's nursing he recovered. Exonerated by the confession, Tom returned to the settlement, presented the confession, and reported his brother as dead. But a trapper had stopped at Joan's cabin, perhaps a couple of weeks after Tom left it. He found the corporal sitting up and well. Upon arriving at the post, the trapper reported this, and Tom was sent back to arrest and bring in his brother, which he did.

"The corporal was thrown into jail at the post, and was to be taken to a larger town for trial. But a mob formed, the corporal was dragged from the jail, and about to be lynched. Joan rushed to the widow of the murdered man, and pleaded with her to tell the truth and save the corporal. After a struggle with the woman she succeeded, got her out to the mob, and her confession was believed. The mob released the corporal and started back to get Tom, who saw them coming and committed suicide. The corporal and Joan were married, and we leave them starting on a honeymoon trip with their 'dog sled.' "

A synopsis of "The Valley of Silent Men," as prepared on behalf of plaintiffs, reads:

"A company of the Royal Northwest Mounted Police is garrisoned in a little village, its jurisdiction extending for a distance of 2,000 miles. The hero, a sergeant of the Mounted Police, James Grenfell Kent, was shot in the chest by an outlaw two weeks before the story opens, and as the story opens Kent is lying in his bed, a dying man. He has been told by a physician that he is dying, and he believes that his end may come within two or three days.

"In the barracks there is confined one Sandy McTrigger, who, 10 years before, had befriended Kent and nursed him through a serious illness and saved his life. McTrigger has been jailed on the charge that he killed one John Barkley. Kent, believing himself to be dying, and anxious to repay his debt to McTrigger, sends for Kedsty, the commandant of the platoon of police,

and a number of witnesses, and in their presence makes a statement to the effect that he, and not Sandy McTrigger, killed John Barkeley. McTrigger is thereupon released by Kedsty, and McTrigger's daughter, Marette, comes into the sick room and falls in love with Kent.

"Kent does not die. On the contrary, his wound heals, and he realizes that he is going to live, and that he will be hanged as a murderer on his own signed confession. Kedsty, the villain in the book, has placed Kent under arrest. Kent makes a futile effort to escape, is recaptured, locked in a cell in the barracks, but Marette rescues him, and Kedsty is killed, and Kent and Marette flee down the river, pursued by the police launch. Their scow is wrecked in the Rapids, and Kent and Marette are separated, each believing the other to be drowned. Subsequently they are united in the Valley of Silent Men, and the mystery of John Barkeley's death and Kedsty's death is cleared up, and Kent learns the story of retribution that has pursued Barkeley and Kedsty for a crime they had committed many years before."

Each of the principal parties to this controversy criticizes the synopsis as prepared by the opposing side as not clearly and fairly setting forth the dominant note contained in the respective stories. As a commentary upon what each such dominant note actually is, it may be well to quote from advertising matter of the book, and from a synopsis of the "I Am the Law," picture which appeared in Motion Picture World of May 27, 1922. Such quotations, it may be assumed, are free from any prejudice or interest growing out of the litigation. The matter about to be quoted is in evidence, not only without objection, but by consent.

The printed cover of the book edition of "The Valley of Silent Men" contained this language:

"When he thought he was dying, Sergeant Kent, the best man-trapper in the Royal Mounted, told a story that branded him as a murderer and set another man free. But the doctor's diagnosis was wrong; death by hanging grinned in the trooper's face. Love of life and of a beautiful girl, who had laughed at him and called him a liar, now made him a fugitive—a hunter become the hunted. With him, down those fabled rivers flowing north to the frozen Arctic, sped the girl, whose own secret winds like a thread of wild magic to the hidden Valley of Silent Men."

The following comment on "I Am the Law" appeared in the Motion Picture News of May 27, 1922:

"The Story.—Officer of Mounted, believing he is going to die, assumes guilt of his brother's crime—the latter also a member of Mounted. The good brother recovers, and the other holds him to his confession and actually arrests him. Eventually, sweetheart of officer secures confession of victim's wife, and the bad brother kills himself to avoid a hanging."

I should say that the purport of these quotations is that in each story the confession of the Royal Mounted trooper gives to the remaining subject-matter of the tale an impetus of interest, and arouses a suspense, that continues until the denouement of the contretemps created by such confessions. Indeed, from the stories themselves, and aside from the quoted comment, I find this to be the fact.

In a book entitled "The Thirty-Six Dramatic Situations" by Georges Polti, and introduced in evidence by defendant, I read this quotation attributed to Goethe:

"Gozzi maintained that there can be but 36 tragic situations. Schiller took great pains to find more, but he was unable to find even so many as Gozzi."

From this, it is argued that in having Sergeant Kent, when he believed himself about to die, make a false confession, Curwood merely used an old and time-worn expedient of creating and holding interest, and that neither he nor his assignees can properly complain because Schrock pursued a similar course for a similar purpose. Then, too, it is suggested, and properly so, that Curwood has no monopoly upon Canadian Northwest stories, and no pre-emption of Royal Mounted Police as characters to act therein. These are admittedly subjects of literary material well within the public domain.

[1, 2] But, while this is true, such subject-matter may be so utilized, as to setting, atmosphere, sequence of events, and detail of narrative, as to constitute an infringement upon the work of one who, while using old and well-known means, has created a novel situation. As was said by Judge Shipman in Banks v. McDivitt, 2 Fed. Cas. 759, No. 961, an author—

"* * * may work on the same original materials, but he cannot exclusively and evasively use those already collected and embodied by the skill and industry and expenditures of another."

Some of the outstanding points of similarity between the two stories are: In each instance the hero and the villain are members of the Royal Mounted Police. Between these characters there exists until near the end of each story an element of conflict that ultimately is resolved in favor of the hero. In each story the hero is the "best man-trapper" in the service, and in each he confesses to a crime of which he was not guilty, and for which the penalty was death by hanging. So, too, does each man hunter become the hunted. Each is finally arrested and confined in the barracks jail, and deliverance comes or begins to come while each awaits transportation to another place for trial. In both stories the only sacrifice the hero believes himself to be making was that of his posthumous reputation, the thought that he would personally be called upon to expiate the crime he had admitted was never appreciated until after the confession had been put forth, and in each case the hero, when he realized possibilities of harm therefrom, had at hand the love of the heroine to sustain him. So, also, do both heroes and heroines resort to flight to escape the consequences of the false confession.

It is likewise a circumstance worthy of comment that, according to both tales, the confession goes directly into the hands of a man calculated to profit thereby, and he, in each instance, ultimately comes to an untimely end. Possibly other points of similarity might be found, but I am of the opinion that such as have been specified are sufficient to indicate that the "same use is made * * * of the same series of events to excite, by representation, the same emotions, in the same sequence." Daly v. Palmer, 6 Fed. Cas. 1138, No. 3,552.

From a careful examination of this record, including the presentation to me of the motion pictures constructed from the Shrock scenario, and from the story of "The Valley of Silent Men," I am constrained to believe that the theme or subject of the latter has in part, at least, been dramatized by defendants in their picture; that it has been reproduced through scenes and incidents coupled with situations by which one of

the kernels of Curwood's composition is emphasized. Dam v. Kirk La Shelle (C. C.) 166 Fed. 589. From this I am forced to the conclusion that there was an effort and design, notwithstanding denials upon the part of Shrock, and of Burr and his associates, that none of them had, prior to this litigation, read Curwood's story, to reap a profit or gain out of material in which others had an exclusive right. This conclusion is supported by the strenuous efforts made by Burr to obtain the privilege of making a motion picture upon the Curwood story, "The Poetic Justice of Uko San," and of the use made of Curwood's name in connection with the picture, "I Am the Law," once the "Uko San" story was acquired.

[3] Reaching this conclusion, it follows that plaintiff is entitled to equitable relief, and the nature of that to be afforded must receive rather careful attention. The picture "I Am the Law" has been extensively advertised, and has been exhibited in various parts of the country. Its exhibition, however, has not been so extensive as it would have been, but for warning letters, claiming an infringement of plaintiff's copyright, widely circulated by the solicitor for plaintiffs. From the testimony adduced at the trial, it is evident that, if any profits have accrued to defendants, they are so small as to be negligible, and from this source plaintiffs cannot hope for much comfort. To afford the latter appropriate protection, it will be necessary to restrain defendants from a further showing and distribution of the picture "I Am the Law" until there has been eliminated therefrom the series of events, incidents, and situations which I have declared to infringe upon plaintiff's copyright. That such an elimination is within the range of possibility would appear from a statement contained in the memorandum of counsel for Burr and his associates as follows:

"If by any chance the court should feel that the confession scene in the picture of the defendants is an infringement of the rights of the plaintiffs, it is respectfully urged that the defendants should be permitted to change that scene, and that the entire picture should not be stopped on this account. This suggestion is made with the thought that a changing of one of the scenes should be preferable to the loss of the entire picture."

If, with fairness and protection to plaintiff, I can preserve any part of defendants' large investment, it is my earnest desire so to do. The possibility of such change will not be complicated by the charge made by Curwood in his companion suit that defendants, by the use of the "Chinese Den" scene in their picture, have also infringed upon a similar scene or event contained in his book "The River's End." This charge is separately considered in the Curwood suit, and is decided in favor of defendants.

So far, therefore, as this litigation is concerned, I will permit defendants, if they can, to undertake to so change the present film of "I Am the Law" as to eliminate any scene, incident, or event that infringes upon the story "The Valley of Silent Men." When this effort has been carried out, the picture as it then appears shall, before being released for distribution or exhibition, be shown to the court and counsel for the plaintiffs, to the end that it may then be determined, without the necessity of further litigation, that there is an infringement of plaintiffs' rights.

Plaintiffs ask, in addition to injunctive relief, damages in the sum of $500,000. Manifestly they can have no such sum. Indeed, I am inclined to believe that any monetary loss has been very small. In this connection it is to be said that the attitude assumed by defendants, since the charge of the infringement was first made, has been characterized with somewhat unusual frankness and consideration. They voluntarily submitted to the examination of plaintiffs the "I Am the Law" film; there has been, I believe, no surreptitious exhibition of the picture; they promptly complied with the terms of the injunction heretofore issued in the Curwood suit; they are now so situated that I consider it extremely doubtful if they can recoup the cost of the picture. While this last fact is not to be the subject of commiseration upon the part of the court, it is, together with the other circumstances, to be considered when it comes to awarding punitive damages.

I think, therefore, that I shall reserve this feature of the case until I am informed as to whether the picture, in changed form, is to continue, or if its exhibition value be entirely destroyed. At the same time the court will hear proof upon the question of actual damages, and as to what punitive damages and counsel fee the defendants are able to pay.

What has just been said has no application to the defendants Warners and Schlessinger. They, I think, should not be burdened with a decree that will do otherwise than restrain their distribution in its present form of the picture "I Am the Law."