## BARNES v. MINER et al.

(Circuit Court, S. D. New York.   March 30, 1903.)

1. COPYRIGHT—DRAMATIC COMPOSITION—SPECTACULAR STAGE PERFORMANCE.

A stage performance consisting of the singing of well-known songs by a woman dressed to personate other singers, prefaced by a short and commonplace dialogue having no reference to such performance, and with a kinetoscope exhibition during the intervals when the performer is changing costume, in which she is shown while making such changes by means of moving pictures previously taken photographically on a film, is not a subject of copyright, the dialogue not being a dramatic composition, within the meaning of the statute, and neither the dialogue, performance, nor exhibition being such as to "promote the progress of science" or "useful arts," within the meaning of the constitutional provision conferring upon Congress power to enact copyright laws, and by which such power is limited.

2. SAME—INFRINGEMENT.

Conceding the validity of such copyright, it is not infringed by a performance in which the performer is a man, and neither the same dialogue, costumes, songs, nor pictures are used, but where the only similarity is in the general plan of the entertainment, and the representation by pictures of the rapid changing of clothing by a person, neither of which can be protected by copyright.

This action is brought by the plaintiff against the defendants to recover damages in the sum of $25,000, which she claims to have sustained by reason of an alleged infringement of plaintiff's copyright of an alleged dramatic composition known as "X-Rays of Society." The complaint sets forth two causes of action, and first seems to set forth generally a simple action at law for damages for said alleged infringement, while the second cause of action seems to be an action under and pursuant to section 4966 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3415] to recover the damages or penalty thereby imposed for the unauthorized public performance and representation of an alleged dramatic composition for which a copyright has been obtained by the plaintiff.

Charles Henry Butler (Henry Staton, of counsel), for plaintiff.

Lawrence & Hughes (Gordon T. Hughes, of counsel), for defendants.

RAY, District Judge. Section 4952 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3406] provides as follows:

"Sec. 4952. Any citizen of the United States or resident therein, who shall be the author, inventor, designer, or proprietor of any book, map, chart, dramatic or musical composition, engraving, cut, print, or photograph or negative thereof, or of a painting, drawing, chromo, statue, statuary, and of models or designs intended to be perfected as works of the fine arts, and the executors, administrators, or assigns of any such person shall, upon complying with the provisions of this chapter, have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending the same; and, in the case of a dramatic composition, of publicly performing or representing it, or causing it to be performed or represented by others. And authors may reserve the right to dramatize or to translate their own works."

Section 4966 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3415] provides as follows:

"Sec. 4966. Any person publicly performing or representing any dramatic composition for which a copyright has been obtained, without the consent of the proprietor thereof, or his heirs or assigns, shall be liable for damages therefor, such damages in all cases to be assessed at such sum, not less than one hundred dollars for the first, and fifty dollars for every subsequent performance, as to the court shall appear to be just."

The plaintiff, Hattie Delaro Barnes, is a resident of the city of New York, and an actress by profession. Prior to November 5, 1897, she invented and wrote "X-Rays of Society," as follows:

Sketch
(X Rays of Society
Showing Quick Changes of Costumes
by
Moving Pictures.)

Enter servant: Madam will be home in a minute and the later Master comes home the better she'll like it. Poor master, what was man made for but to worry and wish his wife loved him. Oh! these society marriages, they let me out, when I gets married it will be for love, just love. (Bell) There she is now.

(Mrs. M.) Muriel! Muriel!

(Servant) Just like them society belles, she don't even know my name's Muriel, and I've telled her a dozen times.

(Enter M.) Muriel!

(Servant) Yes'm.

(Mrs. M.) Are my dresses ready.

(Serv.) Yes'm.

(Mrs. M.) There take my hat and go, no wait, for my gloves (Bus.; fill time in taking off gloves). Wait for me in the dressing room (Servant enters dressing room). (Mrs. M.) Mr. Marter not at home? Another Tammany Meeting I suppose it's about time I grew accustomed to his late hours and a marriage a la mode. (Bus.) Goes to writing desk, looks through papers, also through scrap basket. (Mrs. M.) I can't even find a hint as to where he has gone. I saw him tear up some papers this morning. I wonder if there is anything in the scrap basket? As I live here are pieces of a letter. (Bus. Puts scraps together.) I'll put them together. (Bus. reading letter.) As you're in town come and see The Gaiety Girl. Well he'll not get the glad hand when he comes home. Whenever I'm late he comes home early, and when I think of becoming a model wife (when there's nothing else to do) he abuses my kindness and isn't here to see that sometimes I am in the house before the milk arrives. But that only happens when there are no balls or opera. I vow I would give up public office if I were in his boots. First, its a meeting for Murphy, then Sheehan, they're all office seekers, each separate and individual member appoints the office for himself. They will find they will have to stand solid with Ward, and not leave it to a Divine Providence to

122 F.—31

adjust. If it's Tim·Sullivan's night there'll be a hot time in New·York to-night or a low time in Greater New York. Its a disgrace Richard not being here to-night. I am here for a purpose. I have been asked to get up a performance for charity, receipts for the Junior Republic. I suggested one might be added for the Klondike travelers. It is a long way to skate home. We have been suffering from that gold discovery since March. I wish Richard would put his ore in for silver; that is so much nearer home. However, Richard has promised to pay for my dresses and I shall have all the fun. Mr. Marter was promised the Mayor of Greater New York, if he could get a certain number of gold Democrats. We were going to London in the spring to be presented to the Queen. You know what prestige that has with the four hundred.

(Enter servant.) Lordy Missus, I must play policy sure enough to-night.

(Mrs. M.) Has your master arrived?

(Servant) No, madam.

(Mrs. M.) Well, I will now show the quick changes of costume in the dressing room by moving pictures.

(Servant) Not here, Missus, less Master should see you.

(Mrs. M.) That's right, Muriel, a woman must always be modest and circumspect.

(Servant) Oh Missus, is going to put on bloomers.

(Mrs. M.) You're very modest all of a sudden (aside) or is it a case of thin legs? Now rush.

Song. (Bus.) Evening dress. After song retire to dressing room and change for short dress. This business being shown on screen by moving pictures.

2nd Song. (After pictures.) Appear in short dress. After song retire to dressing room and change for boy. This change of costume also being shown by the moving pictures.

3rd Song. Boy's costume. Good night. (Bus.) Song, lights up, after song lights down for pictures.

2nd Song. Lights up, end of song, lights down for pictures.

3rd Song. Lights up for song, lights down for pictures.

Everything contained therein, and all the incidents and scenes therein, were conceived and invented by the plaintiff, exclusive of all outside sources whatsoever. The plaintiff makes no claim for novelty in the making of changes of costume in the dressing room, but she does claim originality and novelty in her manner of showing such changes of costume, etc., as set forth in said alleged dramatic and literary composition.

On or about the 5th day of November, 1897, at the corner of Mission Place and Worth street, New York City, the plaintiff arranged for certain photographs of herself to be taken by the International Film Company, to be used in connection with her act entitled "X-Rays of Society" upon the stage, and the films showing pictures of herself in said act were taken by the said International Film Company at a rehearsal of the act by her, and the pictures so made were sold to her, and used by her in the exploitation of the said act upon the stage. After the films containing the said pictures were purchased by her from the company, and on or about the 5th day of November, 1897, the plaintiff then being a citizen and resident of the United States of America, and being the sole owner and proprietor of "X-Rays of Society," and which had then never been printed, acted, published, or performed in this or any foreign country, made an application for copyright thereon in the United States, and in all respects complied with the law relating to the taking and obtaining copyrights, and paid the fees required by law. The plaintiff there-

upon received from the Librarian of Congress a certificate of record in the form required by law, containing the title of said composition, and the said title was recorded as required by law. Subsequent to November 5, 1897, and not later than the date of publication thereof in this or any foreign country, the plaintiff deposited in the mail in the United States, addressed to the Librarian of Congress, Washington, D. C., two copies of said alleged dramatic composition printed from type set within the limits of the United States, and paid the fees required by law relating thereto, and in all respects complied with the laws of the United States relating to copyrights. The plaintiff gave information thereof by causing to be printed and inserted upon each and every copy the word "Copyright," together with the year the copyright was entered, and her name, the name of the party by whom it was taken out. By said proceedings the plaintiff intended to hold by virtue of the acts of Congress approved February 3, 1831, c. 16, 4 Stat. 436, and the acts amendatory thereof and supplementary thereto, or subsequent thereto, and relating to or governing copyrights, the sole and exclusive right and liberty to print and publish said "X-Rays of Society," and also the exclusive right to set, act, or perform, or represent the said "X-Rays of Society," or cause it to be set, acted, played, performed, or represented on any stage or public place during the whole period for which said copyright was applied for, and obtained from the Librarian of Congress the certificate following, viz.:

1897, No. 74200.                                                  Bl

Library of Congress, to wit:

Be it remembered,

That on the fifth day of November, 1897, Mrs. Hattie Delaro Barnes, of New York, N. Y., hath deposited in this office the title of a dramatic composition the title or description of which is in the following words, to wit:

X Rays in Society,

the right whereof she claims as proprietor in conformity with the laws of the United States respecting Copyrights.

Office of the Register of Copyrights,
    Washington, D. C.                          John Russell Young,
                                                  Librarian of Congress.
                                               By Thorvald Solberg,
[Ten Cent U. S.                                   Register of Copyrights.
Revenue Stamp
Canceled.]

I hereby certify that the foregoing is a true copy of the original record of copyright.

In witness whereof, the seal of the Librarian of Congress has been hereto affixed this thirtieth day of June, 1900.

Office of the Register of Copyrights,
    Washington, D. C.                          Herbert Putnam,
                                                  Librarian of Congress.
Written O. G. F. 30, 6, 00                     By Thorvald Solberg,
Revised J. W. C. 30, 6, 00                        Register of Copyrights.
Mailed A. I. 10, 7, 00

                    Form B.
                    July 1, 1897                    [Seal Librarian
                    January 16, 1899.                of Congress.]

For the first time in any place, and during Thanksgiving week, 1897, the plaintiff represented upon the stage at Carnegie Hall and

Proctor's Theater, New York City, a public place of amusement, said "X-Rays of Society," and thereafter used the said act, representation, and composition with success at Poli's Theater, in New Haven, in the state of Connecticut, and elsewhere.

The act of the plaintiff in presenting and exhibiting the said "X-Rays of Society" in public was and is as follows: The plaintiff, Hattie Delaro Barnes, in opera cloak and evening dress, has upon the stage at the opening in front of the drop curtain behind the footlights a dialogue with her attendant or maid, during the course of which she speaks as follows: "Well, I will now show the quick changes of costumes in the dressing room by moving pictures." She then leaves the stage, and retires to her dressing room in the theater. The theater and stage are then at once darkened, and the drop curtain is raised, and behind this drop curtain is a large screen. While the plaintiff is in her dressing room rapidly changing her costume from evening clothes to garments such as were worn by Anna Held, there is thrown on the screen by use of a kinetoscope a series of rapidly moving pictures, being the said pictures upon the film made of herself as aforesaid, and which film was owned by herself, showing to the audience the plaintiff in the act of making the quick changes of costume in her dressing room. The last picture in the series shows to the audience the plaintiff in the act of leaving her dressing room in the costume similar to that worn by Anna Held. As this picture disappears from the screen the drop curtain is lowered into position on the stage, the lights in the theater and on the stage are turned up, and the plaintiff walks upon the stage dressed as Anna Held, and sings a broken French song entitled "Pourquoi Pas." After singing this song, the plaintiff immediately leaves the stage, and, in the manner already stated, the house is darkened, and the kinetoscope is made to throw upon the screen a series of moving pictures showing the plaintiff changing her costume from that of Anna Held to that of a boy, and, as before, the last few pictures in the series show the plaintiff in the act of leaving her dressing room wearing the boy costume. As these last pictures disappear from the screen, the drop is lowered into its position on the stage, and the lights are turned up, and the plaintiff appears in person on the stage, and sings a second song, suitable to the character of a boy. At all times, except in the dialogue, the plaintiff appears alone upon the stage. All pictures showing the plaintiff in the dressing room show also her maid or attendant assisting her in changing the costume.

The defendant Edwin D. Miner at all the times mentioned in the plaintiff's complaint was a dramatic manager, and the proprietor of Miner's Booking Offices, and as such he booked not merely acts which he controlled, but also many other acts which were not under his control. At all the dates and times mentioned hereafter as being the dates and times of the alleged infringements, the defendant Edwin D. Miner controlled, governed, and managed and employed the defendant Adolf Zink, who at said dates and times was an actor employed by and under engagement to the said Edwin D. Miner, and at such dates and times the said Edwin D. Miner was engaged, among other things, as such manager and proprietor, in giving or causing

to be given at different theaters in different cities performances, in all of which the defendant Adolf Zink acted or performed the only part therein, and the exact nature of which performances were as follows:

The defendant Adolf Zink is a man of very small stature, not more than 36 inches in height, and he appears upon the stage in conventional evening clothes in front of the "drop in 1"—that is, the first plain drop scene behind the footlights—and addressing the audience he says:

"Ladies and Gentlemen: I will give you an impersonation of several of our best known actors and actresses, making quick changes from one character to another, first showing you Edna May as the Salvation Army Lassie in 'The Belle of New York,' then changing to May Irwin in 'Miss Jones,' then making a change to Lottie Collins singing her famous 'Ta-Ra-Ra Boom-De-Ay' song, and then making a complete change to male attire, changing to 'Bath House John of Chicago.' Remember that good goods come in little packages. I trust you will like this little package. I now invite you all to my dressing room to watch me make my quick changes."

The defendant Adolf Zink then leaves the stage, and retires to his dressing room in the theater. The theater and stage are then at once darkened and the drop in 1 is raised. Behind this drop is a large screen of white muslin, battened at the top and bottom. While Zink, in his dressing room, is rapidly changing his costume from evening clothes to garments such as were worn by Edna May as the Salvation Army girl in the Belle of New York, there is thrown on the white muslin screen by the use of the kinetoscope a series of rapidly moving pictures showing to the audience the defendant Zink in the act of making the quick change of costume above mentioned as being about to be made by him. The last picture in the series shows to the audience the defendant Zink in the act of leaving his dressing room in a costume similar to that worn by Edna May above referred to. As this picture disappears from the screen, the drop above mentioned is lowered into position on the stage, the lights in the theater and on the stage are turned up, and Zink walks on the stage in person, dressed as Edna May, and sings her song "Follow On," taken from the opera "The Belle of New York." After singing the song "Follow On," the defendant Zink immediately leaves the stage, and, in the manner already stated, the house is darkened, the drop is raised, and the kinetoscope is used to throw upon the white screen a series of moving pictures showing the defendant Zink changing his costume from that of Edna May to one such as was worn by May Irwin in her play entitled "Miss Jones." The last few pictures in this series show the defendant Zink in the act of leaving his dressing room wearing the May Irwin costume. As these last pictures disappear from the screen, the drop is lowered into its position on the stage, the lights are turned up, and the defendant Zink in person appears on the stage and sings the song, "I Couldn't Stand to See my Baby Lose," and which was sung by Miss Irwin in her play "Miss Jones." Upon the completion of this song the defendant Zink, in precisely the same manner above described, leaves the stage, and in his dressing room changes his costume from that of Miss Irwin to one similar to that worn by Lottie Col-

lins, and while he is making this change the kinetoscope exhibits on the white screen the series of rapidly moving pictures showing the change. When the defendant appears again on the stage it is in the costume of Lottie Collins in which he sang her song "Ta-Ra-Ra Boom-De-Ay," and in the course of the song he gives an imitation of Miss Collins' dance. Again leaving the stage, the defendant Zink changes his costume from that of Miss Collins to an exaggeration of the costume worn by "Bath House John of Chicago." During the progress of this quick change the kinetoscope again throws on the white screen the pictures showing the change being made, and as the last picture in the series disappears, the drop is lowered, the lights turned up, and the defendant appears upon the stage in the exaggerated costume mentioned, and sings the song entitled "Reggie, the Reigning Rage." At the end of this song the defendant Zink performs a cake walk, or an imitation of one, and this terminates the performance.

All the performances given by Zink prior to the commencement of this action were in detail like the one above described. Zink made no address whatever to the audience except as above stated, and his preliminary statement, as will be observed, is entirely different from that of the plaintiff, except we find the following similarity: The plaintiff says near the end of her preliminary remarks, "Well, I will now show the quick changes of costume in the dressing room by moving pictures," and the defendant says at the close of his preliminary remarks, "I now invite you all to my dressing room to watch me make my quick changes." The defendant says nothing in the hearing of the audience excepting the words above set forth. During the performance given by the defendant Zink no one is on the stage in view of the audience as performer or assistant or otherwise excepting the defendant Zink. There is no dialogue. The songs sung by the plaintiff and by the defendant are entirely different, and neither claims authorship to the ones sung by her or him, respectively. The kinetoscope pictures of the defendant Zink showing him in the act of changing his costume in his dressing room show him as being assisted in his changes by an attendant. In the course of his employment by the defendant Edwin D. Miner the defendant Adolf Zink gave 186 performances of the character above described. The first performance was given March 26, 1900, and the last performance September 16, 1900. The places at which these performances were given by the defendant Adolf Zink and the number of performances given at each place, and the opening date thereof, were as follows: New York City, Miner's 125th Street Theater, 8 performances, beginning March 26, 1900; New York City, Miner's 125th Street Theater, 8 performances, beginning April 2, 1900; New York City, Keith's Theater, 24 performances, beginning April 16, 1900; Philadelphia, Keith's Theater, 24 performances, beginning April 30, 1900; Boston, Keith's Theater, 24 performances, beginning May 14, 1900; Providence, Keith's Theater, 12 performances, beginning May 28, 1900; New Haven, Poli's Theater, 12 performances, beginning June 4, 1900; New York City, Proctor's Fifth Avenue Theater, 12 performances, beginning June 18, 1900; New York City, Proctor's

Pleasure. Palace, 12 performances, beginning June 25, 1900; New York City, Brighton Beach Music Hall, 12 performances, beginning July 2, 1900; New York City, Proctor's Twenty-Third Street Theater, 12 performances, beginning July 9, 1900; New York City, New York Roof Garden, 6 performances, beginning July 16, 1900; Buffalo, Shay's Music Hall, 8 performances, beginning September 3, 1900; Brooklyn, Hyde & Behman's Theater, 12 performances, beginning September 10, 1900.

The kinetoscope, briefly described, is a mechanical contrivance involving, among other things, a transparent or translucent narrow film of very great length, upon which is a series of photographs, very extensive in number, which photographs consecutively represent the continuous development of movement or action in the persons or things which are the subjects of such photographs. This film, by an electric device, is caused to pass in a dark room or theater with great rapidity, by a set of lenses, through which, by use of a powerful electric light, the scenes which are the subject of the series of photographs are, much enlarged, thrown upon the white screen. As one picture or reproduction of the scene photographed succeeds another upon the screen, and with great rapidity, the impression produced upon the retina of the eye by the preceding picture continues longer than does the existence upon the screen of the picture which produces such impression. This is owing to the well-recognized defect of the eye known technically as "persistence of impression." As a result of this persistence of impression, the impression produced by one picture lasts or endures approximately until the impression produced by the next succeeding picture occurs. The result is substantially that one sees upon the kinetoscope screen a continuous moving picture reproducing the action and movement of the scenes photographed upon the film. The kinetoscope and kindred mechanical devices known under other names are the subject of United States letters patent granted prior to November 5, 1897. Neither the plaintiff nor either of the defendants in this cause is, or ever has been, interested, directly or indirectly, in the ownership or proprietorship of the letters patent covering the mechanical devices of the kinetoscope or similar appliances. The plaintiff, in the performance of her sketch "X-Rays of Society," referred to in the complaint herein, and hereinbefore set forth, and the defendants, in the production by the defendant Zink of his impersonations, made use of the kinetoscope or similar mechanical appliances by arrangement, agreement, or license with the owners or proprietors of the letters patent above mentioned, or with licensees of such owners or proprietors; and each had the right to make use of the kinetoscope or similar mechanical appliances. The plaintiff, however, did own the film above referred to and used by her containing the extensive series of photographs consecutively representing her in the act of changing her costume as before stated, and the defendant Miner owned the film containing the extensive series of photographs showing the defendant Zink making his changes of costume hereinbefore specified and stated.

A careful analysis and comparison of the two performances show:

(1) Both the plaintiff and the defendants have, respectively, photographic films, those owned by the plaintiff representing her (a woman) making quick changes of dress or costume, while those owned by the defendant Miner represent the defendant Zink (a man) making quick changes of dress or costume. The plaintiff first represents a woman of some notoriety, and then a boy, possibly others between. When in her dressing room she is represented as being attended by her maid or attendant. The defendant Zink represents females in his changes of costume, except at the end he represents "Bath House John of Chicago." Zink, in his dressing room, is represented as having an attendant.

(2) The performances of both are in public upon a stage having drop curtains and screens.

(3) At the beginning of the performance by the plaintiff she has a commonplace and vulgar and suggestive dialogue of some considerable length with her maid in sight and hearing of the audience, near the end of which she says, "Well, I will now show the quick changes of costume in the dressing room by moving pictures." This prefatory dialogue is neither descriptive of nor connected with what follows.

(4) The defendant Zink, in presence of the audience, introduces his performance by a brief description of what is to be presented, and ends by saying, "I now invite you all to my dressing room to watch me make my quick changes."

(5) In brief, the plaintiff announces a representation of quick changes in costume by means of moving pictures, while the defendant Zink invites the audience to his dressing room to observe him change his costume. The purpose and effect of both announcements as to representations by means of moving pictures is the same.

(6) In each performance the actor then retires to her and his dressing room, respectively, and the curtains or drops behind which there are screens are raised, and, the room being darkened, in the plaintiff's performance there is thrown on the screen by use of the kinetoscope a series of rapidly moving pictures, being those upon the film made of herself showing plaintiff to the audience making quick changes of costume; while in the performance of the defendant Zink, the room being darkened, there is thrown on the screen by the use of the kinetoscope a series of rapidly moving pictures showing him to the audience making quick changes of costume. The changes made by each are entirely different as to the characters represented. Each sings a song at intervals, but the words and music are entirely different.

(7) At the close of plaintiff's exhibition she appears on the stage and sings a song appropriate to the character of a boy, and appears on the stage dressed as a boy. In the exhibition made by Zink, at the close thereof, he appears on the stage in the exaggerated costume of "Bath House John of Chicago," and sings "Reggie, the Reigning Rage." He then performs a cake walk, or an imitation of one, and this closes his performance.

It is apparent that the exhibition given by the defendants is unlike that given by the plaintiff, except that the general plan or plot of showing rapid changes of costume by means of photographic films and the kinetoscope is substantially the same. The main idea and purpose of each performance is to exhibit to the audience by means of moving pictures and the use of the kinetoscope and a screen and darkened room a human being in nude or seminude conditions making quick changes of dress or costume. To just what extent the disrobing extends is not stated, but those who have seen Anna Held upon the stage in her costumes will easily perceive that, to give the representation indicated, the plaintiff must be exhibited at times in a substantially nude condition. Each party has the absolute right to her and his photographic films, and to exhibit same either in motion or stationary, and each has the right to use the kinetoscope for this purpose.

So far as the sensations and impressions conveyed by the two exhibitions or performances to those who see them presented is concerned, it is evident they are not the same, except in the general sense that they are lascivious and immoral. With the male portion of the audience the plaintiff's exhibition would naturally excite passions not necessary to describe. With the chaste females in the audience such exhibition could only produce disgust, while with the other females the performance would excite no particular emotions whatever other than expectancy or curiosity as to its effect on the male portion of the audience. With the male portion of the audience defendant's exhibition would produce no sensation or emotion whatever except expectancy or curiosity as to its effect on the females present, while upon the unchaste females it would naturally excite more or less of lascivious sensations or desires. In neither performance is there anything of a literary or dramatic nature or character or of a nature calculated to elevate, cultivate, inform, or improve the moral or intellectual natures of the audience. Neither performance or exhibition is of a nature to "promote the progress of science" or "of the useful arts."

If the prefatory remarks to the plaintiff's performance are to be regarded as a "dramatic composition," they are not copied or imitated by the prefatory remarks used by the defendants. As already stated, such remarks have no possible connection with what follows, either by way of description, introduction, or explanation. They indicate a condition of domestic infelicity and marital infidelity and gross immorality, and so, perchance, are a proper introduction to the spectacle the plaintiff presents when photographs of herself in the conditions described are enlarged and thrown upon a screen, moving rapidly, and conveying the impressions described. Neither can the prefatory remarks of the defendant Zink be regarded as a "dramatic composition." It would be as proper to characterize the ordinary prefatory remarks of a side show exhibitor at a circus or country fair as a "dramatic composition" as to apply that term to anything said by either the plaintiff or the defendant.

Section 8, art. 1, of the Constitution of the United States, provides :

"The Congress shall have power ❋ ❋ ❋ (8) to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

This provision of the Constitution not only limits the power of Congress in enacting copyright laws to matters which "promote the progress of science and useful arts," but serves to aid us in defining the words "dramatic composition" found in the statute, for it is not to be supposed that Congress intended to include any compositions that would not tend to "promote the progress of science and useful arts." How anything contained in the production of the plaintiff tends in this direction it is difficult to ascertain.

In Martinetti v. Maguire, 1 Abb. U. S. 363, Fed. Cas. No. 9,173, the court said:

"From this it expressly appears that the Constitution did not intend that Congress should pass laws to promote immorality, or anything except science and the useful arts. For this reason an instrument or invention expressly designed to facilitate the commission of crime, as murder, burglary, forgery, or counterfeiting, however ingenious, would not be entitled to be patented. So a real dramatic composition, if grossly indecent, and calculated to corrupt the morals of the people, would not be entitled to a copyright. Such an exhibition neither 'promotes the progress of science or the useful arts,' but the contrary. The Constitution does not authorize the protection of such productions, and Congress cannot be presumed to have intended to have gone beyond their power to give them such protection."

In that case the court, at pages 361 and 362, 1 Abb. (U. S.), Fed. Cas. No. 9,173, said:

"The Black Crook is a mere spectacle; in the language of the craft, a 'spectacular piece.' It has no pretensions to be called a dramatic composition. The dialogue is very scant, and appears in the light of a mere accessory—a piece of word machinery tacked on to the ballets and tableaux. The principal part and attraction of the spectacle seems to be the exhibition of women in novel dress or undress, or in striking attitudes or action. The closing scene is called 'Paradise,' and consists, as witness Hamilton expresses it, 'of women lying about loose'—a sort of Mohammedan paradise, I take it, with imitation grottos and earthly houris. To call such a spectacle a 'dramatic composition' is an abuse of language. An exhibition of model artistes, or a menagerie of wild beasts, might as well be called a dramatic composition, and claim to be entitled to copyright. A menagerie is an interesting spectacle, and so may this be; but it is nothing more. An exhibition of women, whether in the ballet or tableaux, or even 'lying round loose' in such a paradise, is not a dramatic composition and entitled to the benefit and protection of copyright."

The performances in question here are mere spectacular pieces or exhibitions. The dialogue and monologue are very scant—"a piece of word machinery tacked on" to the moving picture tableaux. The words "dramatic or musical composition," used in the statute, as applied in this case, must be held to include only those representations and exhibitions, with or without prefatory and accompanying words, which tend, at least, to "promote the progress of science and useful arts." As thus defined, the plaintiff's production, taken as a whole or in parts, is not a "dramatic composition," not the subject of a copyright, and not entitled to protection. Any person at any place may reproduce it entire if he does not offend the penal statutes of the jurisdiction in which the performance is given. See, also, Broder v. Zeno Mauvais Music Co. (C. C.) 88 Fed. 74; Lawrence v. Smith,

Jacob, 471; Walcot v. Walker, 7 Ves. 1; Shook v. Daly, 49 How. Prac. 366, 368; Drone, Copyr. 181; 7 Am. & Eng. Enc. Law (2d Ed.) 538.

But, quite aside from this, and assuming that the plaintiff's copyright is valid, what does it cover and protect? Clearly not the setting or production of this performance on a stage with drop curtains, screens, and lights turned up or down, for all this is old, and common property. Clearly not the use of photographic films by means of the kinetoscope, or the use of the kinetoscope itself, or the exhibition of rapidly moving pictures, all old, and the right to use the kinetoscope, a patented invention, belonging to both plaintiff and defendants by permission of the owner of the patent; not the songs, for in these—both words and music—the plaintiff had no right not belonging equally to the defendants, and, besides, defendants did not use them; not the mere act or performance of dressing to imitate or impersonate Anna Held or a boy. This plaintiff cannot monopolize such a performance, nor can Congress protect it by a copyright. If plaintiff's copyright covers the prefatory dialogue, it has not been imitated, plagiarized, or infringed. If it covers the right to exhibit the plaintiff's photographic films as rapidly moving pictures by mechanical means and enlarged and displayed to the audience on a screen, there is no imitation or infringement. The photographic films used by the defendants belong to them, and they had the right to display them publicly by mechanical means belonging to them.

Can a person copyright a mere order of events in a play or spectacular representation, the representation being of different scenes and things? "The copyright of a book describing a new system of stenography does not protect the system when considered simply as a system apart from the language by which it is explained so as to make the illustration by another of the same system in a different book, employing totally different language, an infringement." Griggs v. Perrin et al. (C. C.) 49 Fed. 15. See, also, Baker v. Selden, 101 U. S. 99, 25 L. Ed. 841.

In Serrand v. Jefferson et al. (C. C.) 33 Fed. 347, it was held:

"A mechanical contrivance, consisting of a real tank into which real water is made to fall, and running thence off underneath the stage, representing a river, into which in the course of a theatrical play the villain is made to fall from a bridge above, not being a link in the chain of incidents which, together with the speech and action of the performance, constitute a series of events concededly novel, is not such a mechanical contrivance as will be protected by copyright of the play in which it is introduced."

Here we have no play, and what is there that is novel in changing costumes or clothing?

In Daly v. Palmer and Jarrett (C. C.) 6 Blatchf. 256, Fed. Cas. No. 3,552, it was held:

"A written play, consisting of directions for its representation by action, without the use of spoken language by the characters, is a dramatic composition, within that act. [Act Aug. 18, 1856, c. 169, 11 Stat. 138, for protection, etc., of copyrights.] Under the act of 1856 the author of a copyrighted dramatic composition is entitled to be protected against piracy, in whole or in part, by representation. Where all that was substantial and material in a scene of a copyrighted play, a great part of such scene being represented by

actions, and not by spoken language, was used in the same order and sequence of events, and in a manner to convey the same sensations and impressions to those who saw it represented, held that there was an infringement."

But in the case under consideration all that is substantial and material in plaintiff's scene, or play, or performance, or exhibition, whatever we name it, is neither used by the defendants in the same order or sequence of events nor in a manner to convey the same sensations and impressions. The order of events in plaintiff's exhibition is of no materiality whatever. Whether she first changes dress to represent Anna Held, and then changes to represent a boy, is of no particular consequence. Whether Zink first represents Edna May, and then Lottie Collins, and finally "Bath House John of Chicago," or vice versa, is of no particular consequence. All that is material in either exhibition is the representation of a person making rapid changes of clothing, and, were it not for the songs, cake walk, and semi-indecency of the film photographs enlarged and shown to the audience, there would be no merit (?) or materiality or attraction in either exhibition. In short, nothing that is substantial or material in plaintiff's exhibition is used in the defendants' exhibition, except the mere idea of representing rapid changes of clothing by a human being. As before fully stated, the two exhibitions do not convey the same sensations or impressions to the audience, and it cannot be said that there is the same order and sequence of events when a female changes clothing to represent Anna Held (one event), and then again changes clothing to represent a boy (another event), as when a male changes clothing to represent Edna May as the Salvation Army girl (one event), and again changes clothing to represent May Irwin in Miss Jones (second event), and then changes clothing to represent Lottie Collins singing "Ta-Ra-Ra Boom-De-Ay" (a third event), and then make a complete change of clothing to represent "Bath House John of Chicago" (the final event). The only close similarity is in changing clothes or costumes and the consequent exposure of the person—the one, the exposure of the female person, conveying certain sensations and impressions; and the other, the exposure of the male person, conveying entirely different sensations and impressions. Should these exposures alone actually be made, the first would bring a large and enthusiastic crowd (of men), while the second would bring the police only—possibly a few courtesans. Society may tolerate, and even patronize, such exhibitions, but Congress has no constitutional authority to enact a law that will copyright them, and the courts will degrade themselves when they recognize them as entitled to the protection of the law.

In Clayton v. Stone, 2 Paine, 382, Fed. Cas. No. 2,872, Mr. Justice Thompson said:

"In determining the true construction to be given to the act of Congress, it is proper to look at the Constitution of the United States to aid us in ascertaining the nature of the property intended to be protected. Congress shall have power to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their writings and discoveries. The act in question was passed in execution of the power here given, and the object, therefore, was the promotion of science; and it would certainly be a pretty extraordinary view of the sciences to con-

sider a daily or weekly publication of the state of the market as falling within any class of them. They are of a more fixed, permanent, and durable character. The term 'science' cannot, with any propriety, be applied to a work of so fluctuating and fugitive a form as that of a newspaper or price current, the subject-matter of which is daily changing, and is of mere temporary use. Although great praise may be due to the plaintiffs for their industry and enterprise in publishing this paper, yet the law does not contemplate their being rewarded in this way. It must seek patronage and protection from its utility to the public, and not as a work of science. The title of the act of Congress is for the encouragement of learning, and was not intended for the encouragement of mere industry, unconnected with learning and the sciences."

There is a decision which seems to indicate that utter want of literary merit is no objection to the validity of a copyright. Drury v. Ewing, 1 Bond, 540, Fed. Cas. No. 4,095. That was the case of a dressmakers' chart. But that chart was clearly within the meaning of the statute and the Constitution, for, while only slightly literary, it was calculated to promote the useful arts; and in these days dressmaking may not improperly be considered a science. It is uniformly held that advertisements possessing no literary or artistic qualities are not the subject of a copyright. Lamb v. G. R. S. F. Co. (C. C.) 39 Fed. 474; Lamb v. Evans, 67 L. T. N. S. 523. See, also, 47 Alb. Law J. 93; Collender v. Griffith, 11 Blatchf. 212, Fed. Cas. No. 3,000; Ehret v. Pierce (C. C.) 10 Fed. 553. See cases 7 A. & E. Enc. Law, 537. Everything put on the stage or intended for the stage is not the subject of a copyright. It may be amusing and entertaining to many, but this fact does not show it to be a production tending "to promote the progress of science and useful arts," and, if it lacks those elements in a substantial degree, it is not within the purview of the statute, which is not supposed to transcend the Constitution of the United States.

The facts do not make out a cause of action, and the complaint must be dismissed, with costs. Judgment accordingly.